**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

-------------------------------------------------------x
                  :

THERESA FOREMAN,          :     Civil Docket No. _____
                  :
        *Petitioner*,    :     April 24, 2020
                  :
     -vs-             :
                  :     **MOTION FOR POST-CONVICTION**
UNITED STATES OF AMERICA,  :     **RELIEF PURSUANT TO 28 U.S.C. §**
                  :     **2255, PETITION FOR A WRIT OF**
       *Respondent*,   :     **HABEAS CORPUS PURSUANT TO**
                  :     **28 U.S.C. § 2241, AND REQUEST FOR**
D. EASTER, Warden of Federal   :     **EMERGENCY ORDER OF**
Correctional Institution at Danbury, and :     **ENLARGEMENT**
MICHAEL CARVAJAL, Director of the :
Federal Bureau of Prisons, in their official :
capacities                :
        *Respondents.*   :
                  :
-------------------------------------------------------x

## PRELIMINARY STATEMENT

1.    Petitioner Theresa Foreman is a 58-year old woman who suffers from hypertension, for which she is prescribed daily medication, and from obesity.  She was sentenced by this Court on January 6, 2020 to a year and a day for tax evasion, and she self-surrendered on February 28, 2020 to the minimum-security women's camp at FCI Danbury.  In light of the grave threat to her health and life caused by COVID-19—exacerbated by her age and underlying health conditions, which greatly increase her risk of developing serious complications or dying from the disease—Ms. Foreman seeks immediate release with this motion for post-conviction relief brought pursuant to 28 U.S.C. § 2255 and habeas corpus petition brought pursuant to 28 U.S.C. § 2241.

2.    COVID-19 is a highly infectious, novel coronavirus that has infected millions of individuals across the world in less than four months.  Prisons are particularly susceptible to rapid,

uncontrolled viral spread because of the close contact between incarcerated individuals, poor sanitation, and insufficient medical resources. Indeed, FCI Danbury has already numerous confirmed positive cases among prisoners and staff, and one prisoner has died. The conditions at FCI Danbury place Ms. Foreman at urgent risk of exposure to severe illness or death from COVID-19.

3.      Ms. Foreman petitions this Court for release from her unlawful confinement in dangerous conditions. Release is required under § 2255 because Ms. Foreman's previous counsel was ineffective in violation of the Sixth Amendment by failing to move for the Court to delay her self-surrender date to allow her to remain out of custody during the COVID-19 pandemic. In addition, if Ms. Foreman is required to remain incarcerated at FCI Danbury during the pandemic and under current conditions, her sentence puts her at risk of serious illness and death and is neither authorized by statute nor permitted under the Eighth Amendment, which prohibits sentences that are grossly disproportionate to the offense. Release is also required under § 2241 because Ms. Foreman's current conditions of confinement violate the Eighth Amendment. She further seeks immediate enlargement to permit her to serve her sentence under home confinement during the pendency of a decision on this action.

**THE PARTIES**

4.      Petitioner Theresa Foreman, BOP Register No. 26224-014, is imprisoned in the minimum-security women's camp at FCI Danbury. Ms. Foreman is 58-years old and has a medical history of hypertension, for which she is currently being medicated. With a BMI of 37.6, she is also considered obese. If she contracts COVID-19, because of her age and medical conditions, she is at high risk of having a severe case that leads to serious illness or death. She is serving a sentence of imprisonment for a year and a day based on a conviction for tax evasion, and the BOP has calculated her release date to be January 4, 2021. On April 17, 2020, Ms. Foreman mailed a request to Warden

2

Easter for compassionate release or, in the alternative, immediate transfer to home confinement. As of this filing, Ms. Foreman has received no response.

5.      Respondent United States of America is the federal government, represented by the United States Attorney's Office for the District of Connecticut, the governmental entity that prosecuted Ms. Foreman for Tax Evasion in Criminal Case No. 3:19CR62 (VAB).

6.      D. Easter is the Warden of FCI Danbury and, in that official capacity, has immediate custody of Petitioner.

7.      Respondent Michael Carvajal is the Director of the Federal Bureau of Prisons and, in that official capacity, is responsible for the safety and security of all persons, including Petitioner, serving federal sentences at BOP facilities, including FCI Danbury.

## JURISDICTION

8.      Petitioner brings this action pursuant to 28 U.S.C. § 2255 for relief from her detention, which violates the Sixth and Eighth Amendments to the U.S. Constitution, as well as federal statutory law.

9.      This Court has jurisdiction of these claims under 28 U.S.C. § 2255; Art. I, § 9, cl. 2 of the United States Constitution (Suspension Clause) and 28 U.S.C. § 1331, as Petitioner is presently in custody under color of authority of the United States, and such custody is in violation of the Constitution, laws, or treaties of the United States.

10.      Petitioner also brings this action pursuant to 28 U.S.C. § 2241 for relief from her detention, which violates the Eighth Amendment to the U.S. Constitution.

11.     This Court has subject matter jurisdiction over these constitutional claims pursuant to 28 U.S.C. § 2241 (habeas corpus); 28 U.S.C. § 1651 (All Writs Act); Article I, § 1, clause 2 of the U.S. Constitution (Suspension Clause); and 28 U.S.C. § 1331 (federal question).

12.     This Court may grant relief pursuant to 28 U.S.C. § 2241, 28 U.S.C. § 2255, 5 U.S.C. § 702, and the All Writs Act, 28 U.S.C. § 1651.

## VENUE

13.     As the Court that presided over Ms. Foreman's federal criminal plea and sentencing, the District of Connecticut is the appropriate venue pursuant to 28 U.S.C. § 2255.  Because a substantial part of the events or omissions giving rise to these claims occurred in this district, this District is also the appropriate venue pursuant to 28 U.S.C. 1391(b)(2).

14.     Venue is also proper in this judicial district pursuant to 28 U.S.C. § 2241(d), because Petitioner is in custody in this district, and pursuant to 28 U.S.C. § 1391(e)(1), because a substantial part of the events or omissions giving rise to Petitioner's claims occurred in this district.

## FACTUAL ALLEGATIONS

### Ms. Foreman's Plea and Sentencing

15.     Petitioner Theresa Foreman is currently incarcerated at FCI Danbury.  She is detained at the "Camp," which is a minimum security facility.  Her projected date of release is January 4, 2021.  The instant case was her first criminal conviction.

16.     On March 4, 2019, Ms. Foreman appeared before this Court to waive indictment, and entered a guilty plea to one count of Tax Evasion in violation of 26 U.S.C. § 7201.  The plea agreement provided that due to the tax loss amount, her guideline range was 37 to 46 months.  On that same

date, Ms. Foreman entered a non-surety bond for $10,000 and was permitted to remain at liberty while awaiting sentencing.

17.    Upon information and belief, Ms. Foreman was fully compliant with the conditions of her release while awaiting sentencing.  During that time period, Ms. Foreman also took steps to reduce her restitution by, among other things, selling her home.  These steps were consistent with the agreements she made in the plea agreement.

18.    On January 6, 2020, Ms. Foreman appeared before this Court for sentencing.  At the conclusion of the hearing, the Court imposed a sentence of one year and one day of imprisonment, a period of supervised release for three years, and a special assessment of $100.  ECF No. 46.  The Court entered a restitution order on April 3, 2020.

19.    At the hearing, the Court also ordered that Ms. Foreman self-surrender to the Bureau of Prisons on February 28, 2020 by 2:00pm.  The request for this date was proposed by counsel for Ms. Foreman.

20.    Ms. Foreman has not filed a notice of appeal in the criminal matter.

**Ms. Foreman's Period of Incarceration**

***The COVID-19 pandemic endangers everyone, and presents a particular risk for prisoners who cannot physically distance from other people and who have certain medical conditions.***

21.    Ms. Foreman self-surrendered to FCI Danbury on February 28, 2020.  FCI Danbury is a low security facility that currently incarcerates men, with an adjacent low security satellite prison that incarcerates women ("FSL") and a minimum security satellite camp that incarcerates minimum security women (the "Camp"). Ms. Foreman has been housed since she arrived at FCI Danbury at the Camp.  At the time she arrived, the COVID-19 had already started to take hold in the United States and had been pronounced by the World Health Organization as a global health emergency.

5

22.     COVID-19 is the potentially deadly disease caused by a novel coronavirus that has sparked a global pandemic.

23.     The COVID-19 pandemic endangers everyone, especially prisoners who cannot physically distance or maintain personal hygiene.

24.     The CDC has reported that, as of April 22, 2020, there were 828,441 confirmed cases of COVID-19 in the U.S. and 46,379 people have already died.[1]

25.     The Connecticut Department of Public Health ("DPH") has reported that, as of April 23, 2020, in Connecticut, there were 23,100 confirmed cases and 1,639 deaths attributed to COVID-19.[2]  FCI Danbury is located in Fairfield County, which has the highest number of confirmed cases of COVID-19 and deaths attributed to COVID-19 in the state: as of April 23, 2020, there were 10,008 confirmed cases of COVID-19 and 615 COVID-19 associated deaths.[3]

26.     The novel coronavirus that causes COVID-19 is highly contagious. It spreads from person to person through respiratory droplets, close personal contact, and contact with contaminated surfaces and objects, where the virus can survive for up to three days. Critically, people who are asymptomatic or pre-symptomatic can unknowingly transmit the virus, making it particularly difficult to slow its spread.[4]

---

[1] *See* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html
[2] *See* https://portal.ct.gov/-/media/Coronavirus/CTDPHCOVID19summary4232020.pdf?la=en
[3] *Id.*
[4] *See* Declaration of Dr. Jaimie Meyer, Exhibit A at ¶ 20.

27.     COVID-19 is potentially fatal. According to estimates from the CDC and the World Health Organization, the mortality rate among confirmed cases of COVID-19 is significantly higher—possibly, 10 to 30 times higher—than from severe seasonal influenza.

28.     On April 22, 2020, the *Journal of the American Medical Association* ("JAMA") published the first large study of hospitalized COVID-19 patients, which demonstrated that those with obesity, hypertension, and diabetes are at the greatest risk for complications from COVID-19.[5]

29.     The CDC has identified prisons, along with nursing homes, long-term care facilities, group homes, and cruise ships, as environments that are especially susceptible to rapid outbreaks of infection due to close person-to-person contact among large, confined populations.[6]

30.     Even people who survive COVID-19 often suffer excruciating pain from infection; severe damage to lung tissue, including a permanent loss of respiratory capacity; and damage to other vital organs, such as the heart and liver.

31.     Serious complications from COVID-19 can develop rapidly. Some patients show the first symptoms of infection within two days of exposure, and their conditions can seriously deteriorate in less than five days.

---

[5] *See* Safiya Richardson, et al., "Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area," *JAMA*, Apr. 22, 2020, available at https://jamanetwork.com/journals/jama/fullarticle/2765184; *see also* CDC, *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 — COVID-NET, 14 States, March 1–30, 2020*, Weekly / April 17, 2020 / 69(15);458–464, https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm
[6] *See* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

32.     Most people in high-risk categories who develop serious illness require advanced medical support, including specialized equipment, such as ventilators, and large teams of highly trained care providers, such as ICU doctors, nurses, and respiratory therapists. The artificial ventilation process is itself invasive and dangerous, and some patients must be placed in medically induced comas for such treatment.

33.     Given the need for advanced and urgent intervention, often in an ICU environment, people with severe cases of COVID-19 cannot be shackled or otherwise restrained, nor can they be subjected to constant, close supervision by correctional staff, as they would be in a typical correctional setting. FCI Danbury cannot provide advanced support in an ICU setting with ventilators, certainly not for a substantial group of seriously ill prisoners who may require such specialized care.

34.     There is no vaccine or cure for COVID-19, and there is no widely available therapeutic treatment that has proven safe and effective.

35.     According to CDC guidelines, only two measures are known to be effective in reducing the spread of this disease: (1) diligent "social or physical distancing," which involves keeping at least six feet of space between people to avoid transmission of the virus, and (2) vigilant hygiene practices, including frequently washing hands and regularly disinfecting surfaces. Physical distancing is a necessary predicate for hygiene practices to have any meaningful impact.

36.     Because asymptomatic or pre-symptomatic people can transmit the virus to others, it is critical to follow CDC guidelines, including social distancing, even among people who show no signs of COVID-19 and appear to be healthy.

37.     These measures are not possible in prisons, like FCI Danbury, without substantial reductions in the prisoner population. Even "modified lockdowns" cannot establish effective social

distancing, given the way in which prisoners sleep, eat, congregate, recreate, and receive medical treatment; nor do such correctional measures ensure the implementation of necessary hygiene practices, particularly when adequate supplies of free soap, sanitizers, disinfectants, and paper towels are not available.[7]

38.     At all times, prisoners and staff interact in close proximity under cramped conditions that are designed to confine people rather than distance them; as a result, correctional facilities are highly susceptible to rapid transmission of the virus through contact with other persons, including asymptomatic carriers who show no signs of illness, and common surfaces.

39.     Moreover, prisoners, correctional staff, and contractors regularly move in and out of correctional facilities, and such movement creates an ever-present risk that persons, including asymptomatic carriers, will carry the virus into and out of those facilities, spreading infection and triggering outbreaks.

40.     The recent deadly outbreaks in the Cook County Jail in Chicago, and at the Rikers Island Jail in New York, where the transmission rate for COVID-19 is estimated to be the highest in the world, demonstrate the terrible dangers that prisons pose to public health, inside and outside the walls, during this pandemic.[8]   In Arkansas, 38% of the positive COVID-19 cases in the state are

---

[7] *See* Declaration of Dr. Jaimie Meyer, Exhibit A at ¶ 9, 11 and 39.
[8] *See* Alleen Brown, *Inside Rikers: An Account of the Virus-Stricken Jail from a Man Who Managed to Get Out*, Intercept, April 21 2020, https://theintercept.com/2020/04/21/coronavirus-rikers-island-jail-nyc/; Timothy Williams & Danielle Ivory, *Chicago's Jail Is Top U.S. Hot Spot as Virus Spreads Behind Bars*, N.Y. Times, April 8, 2020, https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html.

concentrated in one prison (which has 850 confirmed cases).[9] In Ohio, mass testing of everyone at the Marion Correctional Institution revealed 1,828 confirmed cases among inmates, which represents 73% of the population. 109 staff members were also positive.[10]

**FCI Danbury is the Site of One of the Worst COVID-19 Outbreaks in the Federal Prison System, and the Bureau of Prisons has Failed to Exercise its Authority to Transfer Petitioner to Home Confinement**

41.      FCI Danbury is the site of one of the worst COVID-19 outbreaks at BOP facilities nationwide. On April 24, 2020, the BOP reported that FCI Danbury currently has 15 prisoners and 32 staff members with positive COVID-19 tests.[11]  One person incarcerated at FCI Danbury has died of COVID-19. Notably, BOP's numbers do not include people who previously tested positive for COVID-19 and have since been deemed recovered by BOP.  A news article on April 15, 2020 said that BOP reported on that date that there were 44 prisoners and 39 staff infected at FCI Danbury.[12] BOP's data does not state where the incarcerated people who tested positive have been housed, and who may have been exposed to staff members who have tested positive.

---------------------------

[9] *See* Zach Budryk, *38 percent of Arkansas COVID-19 cases concentrated in state prison*, The Hill, April 21, 2020, https://thehill.com/homenews/state-watch/493988-38-percent-of-arkansas-covid-19-cases-concentrated-in-states-prison
[10] *See* https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-inmates-at-an-ohio-prison-test-positive-for-coronavirus
[11] *See* https://www.bop.gov/coronavirus/
[12] *See* https://www.floridaphoenix.com/2020/04/15/covid-19-deaths-in-federal-prisons-rise-to-15-about-700-staff-and-inmates-sick/

42.     In a March 26, 2020, memorandum to Respondent Carvajal, Attorney General William Barr identified home confinement as "[o]ne of the BOP's tools to manage the prison population and keep inmates safe" from COVID-19.[13]

43.     Attorney General Barr directed Respondent Carvajal "to prioritize the use of [the BOP's] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic," because "for some eligible inmates, home confinement might be more effective in protecting their health."

44.     Attorney General Barr further identified "[t]he age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines," and "the security level of the facility," with "priority given" to prisoners incarcerated "in low and medium security facilities," as two of the critical, discretionary factors for consideration.

45.     On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (CARES Act, P.L. 116-136), which authorizes the BOP Director to lengthen the maximum amount of time for which a prisoner may be placed on home confinement "as the Director determines appropriate" when the Attorney General "finds that emergency conditions will materially affect the functioning" of BOP. The authority is limited to "the covered emergency period," which is defined as the period spanning from the President's declaration of a national emergency with respect to COVID-19 to the date that is 30 days after the date on which the declaration terminates.

---

[13] *See* https://www.justice.gov/file/1262731/download

11

46.     In an April 3, 2020, memorandum to Respondent Carvajal, following the dramatic increases in confirmed COVID-19 cases at FCI Danbury and two other BOP facilities (FCI Oakdale in Louisiana and FCI Elkton in Ohio), Attorney General Barr affirmed the BOP's "profound obligation to protect the health and safety of all inmates."[14]

47.     Attorney General Barr stated: "As you know, we are experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton. We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions. I would like you to give priority to these institutions, and others similarly affected, as you continue to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards. In addition, the CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities, consistent with the guidance below."

48.     Attorney General Barr further recognized that, despite "extensive precautions to prevent COVID-19 from entering [BOP] facilities and infecting our inmates," those measures "have not been perfectly effective." Accordingly, he ordered the BOP to take more aggressive steps, immediately, to transfer prisoners to home confinement, even if electronic monitoring will be not be available.

_____

[14] *See* https://www.justice.gov/file/1266661/download

12

49.     Echoing the warnings of public health experts, Attorney General Barr stated: "Given the speed with which this disease has spread through the general public, it is clear that time is of the essence."

50.     In spite of Attorney General Barr's statements, Respondents have failed to use the BOP's available statutory authority to reduce the population of FCI Danbury with sufficient speed or in sufficient volume to mitigate the severe risk posed by COVID-19.

51.     From March 26 (the date of Attorney General Barr's first memo) through April 23, the BOP states that it has placed 1,501 prisoners nationwide into home confinement, which is roughly 0.83% percent of the approximately 180,000 prisoners in BOP custody.

52.     The significance of this statistic is further diminished because the BOP has not disclosed the number of prisoners it typically released per day prior to Attorney General Barr's memos, nor has it disclosed how many new prisoners have entered BOP custody during the same time period. In short, data from the BOP demonstrate that it is not releasing enough prisoners to protect federal prisons from COVID-19.

53.     Notably, between April 16, 2020 and April 23, 2020 the population of the camp where Ms. Foreman is housed at FCI Danbury was reduced by only two prisoners.

***Petitioner is housed in the Minimum Security Camp at FCI Danbury, where she is unable to physically distance herself from other prisoners and from staff exposed to COVID-19.***

54.     The Camp at FCI Danbury houses women who present the lowest risk of any federal prisoners. Indeed, the Camp at Danbury does not even have perimeter fencing. As of April 23, 2020, the BOP reports that 153 prisoners are incarcerated at the Camp.

55.    Most of the women in the Camp are non-violent offenders serving relatively short sentences or nearing their release dates. They are designated to the Camp for many of the same reasons that make them appropriate for immediate transfer to home confinement.

56.    The BOP has reported numerous confirmed COVID-19 cases among prisoners and staff.  The BOP has not provided information as to how many confirmed cases involve women incarcerated at the Camp or staff who have come into contact with women at the Camp.

57.    Staff at Danbury rotate between the men's prison, the FSL, and Camp, interacting with prisoners at each location. Several staff members typically posted at the Camp have been out sick.

58.    Numerous prisoners at the men's facility and the women's FSL who are exhibiting COVID-19 symptoms including coughing, shortness of breath, and fever have not been tested for the virus and have not been removed from general population.

59.    Because of frequent asymptomatic transmission, as documented by the CDC and DPH, and the lack of effective, widespread testing by the BOP, it is likely that there already are numerous undetected but highly contagious COVID-19 infections among the prisoners and staff at the Camp and other FCI Danbury facilities.

60.    In an "Imminent Danger Report" filed with the Occupational Safety and Health Administration ("OSHA") on March 31, 2020, the President of the union that represents many BOP staff reported health and safety hazards across many BOP facilities related to COVID-19, including:

> a.  Contrary to CDC guidelines, officials have directed staff throughout the BOP who have come into contact with, or been in close proximity to, individuals who show or have shown symptoms of COVID-19, to report to work and not self-quarantine for 14 days;

14

b.  The BOP has violated CDC guidelines by continuously moving prisoners by bus and/or airlift to various prison sites across the nation, including infected prisoners, prisoners suspected of being infected, and prisoners who have been in close contact with, or proximity to, infected prisoners;

c.  The BOP has failed to introduce workplace controls to mitigate exposure or further exposure to the virus, such as high efficiency air filters to minimize the airborne nature of the virus or otherwise improve ventilation;

d.  The BOP has failed to minimize contact within recreation areas, education areas, and counseling/treatment rooms, resulting in prisoners and staff coming in dangerously close contact with each other; and

e.  The BOP has failed to comply with OSHA Personal Protective Equipment Standards.[15]

61.     In the Camp at FCI Danbury, it is impossible for prisoners, like Ms. Foreman, to stay at least six feet away from other prisoners and, therefore, to engage in effective social distancing, as the CDC has recommended.

62.     Prisoners at the Camp occupy a single building that is divided into four dorms: A, B, C, and D. Within each dorm, women sleep in a common space that is divided into open cubicles, each with a bunk bed that sleeps two women. The cubicles have no doors, and their dividing walls do not extend to the ceiling.  The bunk beds are close enough that occupants in one bed can reach

---

[15]*See* https://www.afge.org/globalassets/documents/generalreports/coronavirus/4/osha-7-form-national-complaint.pdf

out and touch the individual in the neighboring bed.  As of April 20, 2020, the A and B dorms each

housed 48 inmates, C dorm housed 47, and D housed 12.  Ms. Foreman is detained in Dorm B.

63.     Camp prisoners are responsible for cleaning their own cubicles. These shared living

spaces are not regularly or properly disinfected to prevent the spread of COVID-19.

64.     Within each of the four dorms at the Camp, there is a common area containing

toilets, sinks, and showers. In Dorm A, there are 3 toilets and 4 showers that are currently being

shared by 48 women. In Dorm B, 48 women share 5 toilets, 6 showers and 6 sinks. In Dorm C, 47

women share 5 toilets and 5 showers. The common toilets, sinks, and showers are not regularly or

properly disinfected to prevent the spread of COVID-19.

65.     The Camp contains one common area with telephones, computers, and "video-

visiting" machines. These items are shared by women housed in all four dorms. The phones,

computers, and video machines are clustered close together in the shared common space, and are

not cleaned or disinfected between uses. For the entire Camp, there are a total of 4 phones, 7

computers, and 3 video machines that are operational. The common area also includes hot water

taps and sinks for washing dishes.

66.     The Camp is currently on lockdown. Under the lockdown, the women in each dorm

are let out of the dorm for one hour a day at different times of the day. This is their only time of day

to have recreation and to access the common area to try to use the phones, computers, video

machines.

67.     Staff move throughout the day among all four dorms for count, food delivery, and

commissary.

68.     Prisoners have been given masks but not gloves. Staff do not consistently wear

masks or gloves.

16

69.     On April 16, 2020 there were 155 women housed in the Camp. This number was reduced by only two prisoners (to 153) by April 23, 2020.

70.     Although some women in the Camp have been told they were on a "list" for home confinement, these woman have not been released. The only known releases that have resulted from COVID-19 are release of a pregnant woman and a woman with Parkinson's disease. Petitioner has not been told that she is on a list for home confinement.

## CLAIMS FOR RELIEF

### COUNT ONE
### Violation of the Eighth Amendment
### (28 U.S.C. § 2255)
### *Petitioner versus United States*

71.     The Petitioner incorporates by reference each and every allegation contained in the proceeding paragraphs as if set forth fully herein.

72.     The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

73.     Ms. Foreman's sentence violates the Eighth Amendment because it is cruel and unusual and grossly disproportionate to her offense.

74.     Here, Ms. Foreman, who had never been previously arrested, pled guilty to tax evasion, a non-violent offense.

75.     Ms. Foreman has now been condemned to serve her sentence at substantial risk of serious illness or death.  COVID-19 is spreading rapidly in FCI Danbury.  Ms. Foreman is being treated at FCI Danbury for hypertension, which makes her significantly more vulnerable to complications should she contract COVID-19.  Indeed, the WHO-China Joint Mission Report provided historical mortality rates for those who contracted COVID-19 with specific pre-existing

conditions. For those with hypertension, the mortality rate was 8.4%.[16]  Ms. Foreman is also

clinically obese, which has been identified as the primary risk factor for individuals who, like Ms.

Foreman, are under the age of 60.[17]

76.     Although the Judgment in this case only sentences Ms. Foreman to one year and one

day in prison, there is a grave risk that she will not make it out of FCI Danbury alive or will become

terribly ill.  A sentence of intended short duration that could, in fact, be a life sentence or result in

serious health risks is grossly disproportionate for any offender, let alone for a first-time non-violent

offender who committed the criminal conduct at issue.  Such a sentence is cruel and unusual

punishment in violation of the Eighth Amendment and must be vacated, set aside, or abated until

the health and death risks from COVID-19 exposure in prison end.

**COUNT TWO**
**Violation of Federal Sentencing Statutes**
**(28 U.S.C. § 2255)**
***Petitioner versus United States***

77.     The Petitioner incorporates by reference each and every allegation contained in the

proceeding paragraphs as if set forth fully herein.

---

[16] *See* Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World
Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-
source/coronaviruse/whochina-joint-mission-on-covid-19-final-report.pdf

[17] *See* Rony Caryn Rabin, "Obesity Linked to Severe Coronavirus Disease, Especially For Younger
Patients," NY Times, Apr. 17, 2020 ("[N]ew studies point to the condition in and of itself as the
most significant risk factor, after only older age, for being hospitalized with Covid-19, the illness
caused by the coronavirus."), https://www.nytimes.com/2020/04/16/health/coronavirus-obesity-
higher-risk.html (last accessed April 22, 2020).

78.     Ms. Foreman's sentence is an unauthorized sentence in violation of federal sentencing statutes. Under 18 U.S.C. § 3551 (titled "Authorized Sentences"), a defendant who is found guilty of an offense "shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case."  18 U.S.C. § 3551.  Section 3551 provides that "[a]n individual found guilty of an offense shall be sentenced, in accordance with the provisions of section 3553" to probation, a fine, or a "term of imprisonment as authorized by subchapter D."

79.     Under Section 3553(a), the Court must impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentences, namely the need for the sentence imposed: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2).

80.     Section 3582 provides that "[t]he court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582.

81.     The authorized term of imprisonment for a violation of 26 U.S.C. § 7201 is "not more than five years."  When Congress authorized "imprisonment" for Ms. Foreman's crime, Congress did not intend to authorize the detention of an individual in conditions that present a grave risk of death

19

from disease.  Such a sentence does not further any permissible purpose of sentencing set forth by Congress in 18 U.S.C. § 3553(a)(2).

82.     Ms. Foreman's sentence is potentially a life sentence as a result of her exposure and vulnerability to COVID-19 and serious risk of death from the disease, and accordingly constitutes an unauthorized sentence in violation of 18 U.S.C. §§ 3551, 3553, and 3582.

83.     Although authorized when imposed, the pandemic has transformed Ms. Foreman's sentence into an illegal sentence and relief is required under 28 U.S.C. § 2255.

**COUNT THREE**
**Sixth Amendment Violation: Ineffective Assistance of Counsel**
**(28 U.S.C. § 2255)**
*Petitioner versus United States*

84.     The Petitioner incorporates by reference each and every allegation contained in the proceeding paragraphs as if set forth fully herein.

85.     Ms. Foreman was denied her right to effective assistance of counsel under the Sixth Amendment to the United States Constitution because her previous counsel failed to delay Ms. Foreman's self-surrender date to account for the COVID-19 pandemic. Under the Sixth Amendment, a defendant has the right to the effective assistance of trial counsel.  To establish a claim of ineffective assistance of counsel, a petitioner must show "not only that [her] counsel's representation was fundamentally defective, but also that, but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different." *Aparicio v. Artuz*, 269 F.3d 78 (2d Cir. 2001) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

86.     Ms. Foreman was sentenced on January 6, 2020. At the conclusion of the sentencing hearing, her counsel requested a self-surrender date of February 28, 2020.

87.     By the time of her surrender to the Bureau of Prisons, COVID-19 had killed more than 2,800 people worldwide and there had been more than 83,000 cases.[18]  On January 30, 2020, the World Health Organization had declared the coronavirus outbreak to be a global health emergency.[19]  The United States had confirmed its 64th case and there was clear evidence of community transmission.[20]  The COVID-19 outbreak was at the World Health Organization's highest level of alert, yet counsel did not seek to continue her self-surrender date to delay the date she entered into custody.

88.     Counsel's performance fell below objectively reasonable standards because counsel did not move to request a delayed surrender date.

89.     Under these circumstances, it was deficient for counsel to have failed to seek a delayed self-surrender date in response to the growing pandemic.  Ms. Foreman had been compliant with her conditions of release.  She had no criminal history and was convicted of a non-violent offense of tax evasion.  The exceptional circumstances presented by the COVID-19 pandemic would have warranted a delayed surrender date.

90.     But for counsel's deficient performance, the Court would have deferred a date for self-surrender.

_____

[18]*See* https://www.cnn.com/asia/live-news/coronavirus-outbreak-02-28-20-intl-hnk/index.html
[19]*See* https://www.npr.org/sections/goatsandsoda/2020/01/30/798894428/who-declares-coronavirus-outbreak-a-global-health-emergency.  By March 11, 2020, the WHO had declared it to be a pandemic.  *See* https://www.bbc.com/news/world-51839944
[20]*See* https://www.cnn.com/asia/live-news/coronavirus-outbreak-02-28-20-intl-hnk/index.html

**COUNT FOUR**
**Unconstitutional Conditions of Confinement in**
**Violation of the Eighth Amendment to the U.S. Constitution**
**(28 U.S.C. § 2241)**
*Petitioner versus Warden Easter and Director Michael Carvajal*

91.     Petitioner incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

92.     The Eighth Amendment to the U.S. Constitution guarantees Petitioner the right to be free from cruel and unusual punishments.

93.     Prison conditions that pose an unreasonable risk of serious harm to a prisoner's health constitute cruel and unusual punishment when a prison official has acted with deliberate indifference to that risk.

94.     Ms. Foreman faces an unreasonable risk of serious harm to her health from potential infection with COVID-19, which can result in serious illness, permanent injury, and death.

95.     Although the serious risks from COVID-19 are obvious to Respondents, they have nevertheless acted with deliberate indifference to the unreasonable risks posed to Ms. Foreman.

96.     On a daily basis at FCI Danbury, Respondents deny Ms. Foreman the ability to engage in effective social distancing—which the CDC has identified as critical to decreasing the risk of deadly infection.

97.     Respondents have failed to use their authority to order compassionate release, 18 U.S.C. §§ 3582(c) and 4205(g), and/or transfer to home confinement, 18 U.S.C. § 3652(c)(2) and P.L. 116-136, 134 Stat. 281 (Mar. 27, 2020) ("CARES Act"), § 12003(b)(2) of Ms. Foreman. Respondents have also failed to discharge their statutory duty of care.  18 U.S.C. § 4042(a)(2) and (3).

22

## REQUEST FOR ENLARGEMENT AS A PROVISIONAL REMEDY

98.     Federal district courts have authority, when habeas actions are pending, to "enlarge" the custody of petitioners. Enlargement is not release. Rather, it is a provisional remedy that modifies custody by expanding the site at which it takes place, upon order of the court, from a particular prison to another setting; as requested here, to home confinement. *See* Ex. B, Resnik Decl. ¶¶ 28-29. The enlargement power stems from Congress's authorization of federal judges under the habeas statutes to "summarily hear and determine the facts, and dispose of the matter as law and justice require" as well as the courts' inherent powers. *See* 28 U.S.C. § 2243.

99.     To qualify for the enlargement remedy, an individual must show "extraordinary circumstances" and that the underlying claim raises "substantial claims." *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001).

100.    As detailed in the accompanying memorandum in support of the request for enlargement, Ms. Foreman meets these requirements because of the extreme risk that COVID-19 poses, especially in light of her age and medical conditions, and because of the particular conditions of confinement at FCI Danbury. If she remains incarcerated, there is a high risk that she will contract COVID-19 and, as a result, suffer severe illness or death. Immediate release to permit Ms. Foreman to serve her sentence on home confinement during the pendency of this action is thus the only way to effectuate the eventual habeas remedy.

## PRAYER FOR RELIEF

WHEREFORE, based upon the foregoing, Petitioner, THERESA FOREMAN, prays that the Court grant her the following relief:

(1)     Grant immediate enlargement to Ms. Foreman pending disposition of the underlying petition;

23

(2)     Order prompt return by Respondents;

(3)     Issue a Writ of Habeas Corpus and order Ms. Foreman's immediate release from custody;

(4)     Vacate, set aside, or abate Ms. Foreman's sentence until the health and death risks from COVID-19 exposure in prison ends;

(5)     Declare pursuant to 28 U.S.C. §§ 2201 and 2202 that Ms. Foreman's sentence under the current conditions at FCI Danbury can no longer be lawfully served pursuant to federal statutes and the U.S. Constitution;

(6)     Award her costs and reasonable attorneys' fees;

(7)     And grant such other and further relief as this Court deems just and proper.

.

THE PETITIONER,
THERESA FOREMAN

FEDERAL DEFENDER OFFICE


Date: April 24, 2020             /s/ Allison M. Near_____
                                 Assistant Federal Defender
                                 265 Church Street, 7th FL
                                 New Haven, CT 06510
                                 Phone: (203) 498-4200
                                 Bar No.: ct27241
                                 Email: Allison_Near @fd.org

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on April 24, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

<u>/s/ Allison M. Near</u>